Ramona ARNOLD, Plaintiff,

v.

CITY OF SEMINOLE, OKLAHOMA; Gene Price, Mayor of the City of Seminole; David Harris, City Manager, City of Seminole; Bill Jordan, Police Chief, City of Seminole; Lt. Larry Herdlitchka, Policeman, City of Seminole; all as individuals and in their official capacities, Defendants.

No. 83–117–C.

United States District Court, E.D. Oklahoma.

July 10, 1985.

Jack De McCarty, Mary Victoria Dycus, Joseph W. Strealy, Oklahoma City, Okl., for plaintiff.

Jim L. Lindsey, Hood & Lindsey, Tulsa, Okl., for defendants.

## ORDER

H. DALE COOK, Chief Judge.

Plaintiff Ramona Arnold brings this action pursuant to the provisions of Title VII of the Civil Rights Act of 1964 as amended (42 U.S.C. § 2000e, *et seq.*), Title 42 U.S.C. § 1983, and certain pendent state claims.

The plaintiff, Ramona Arnold, alleges that beginning in February of 1977 when she became a patrol officer for the City of Seminole, Oklahoma, and continuing until January, 1984, defendant Herdlitchka and other police officers sexually harassed plaintiff, which harassment included such acts as lewd and vulgar sexual comments and innuendos communicated by sexually graphic and explicit pictures and photographs placed in various rooms in the police department and by comments that women were not fit to be police officers, all of which were unsolicited and uninvited. Plaintiff claims that defendant Herdlitchka and other police officers did not subject male employees to such sexual harassment or such a hostile and offensive working environment.

Plaintiff further alleges that she was treated in a discriminatory manner as follows: that she was not warned before incurring an official reprimand for violations of departmental policy while male officers were so warned; that she was docked compensatory time for times she was ill and for doctors' appointments while male officers were allowed sick leave on the authority of defendant Herdlitchka; that although she had seniority, defendant Herdlitchka and other supervising officers denied her the benefits and increased responsibility of such seniority.

According to the plaintiff, Ramona Arnold, all of the foregoing acts comprise discriminatory treatment and sexual harassment, and have created a hostile and offensive working environment.

Plaintiff further alleges that although she complained in 1977, 1978, and 1979 to the Seminole Police Chief Tom Lemmings and to City Manager, Don Hamilton, in 1980 to Acting Police Chief Jim Downing, and in 1981 and 1982 to defendants Police Chief Bill Jordan and City Manager David Harris, she was continuously subjected to such indignities as have been described herein. According to plaintiff, no remedial action was taken and no departmental investigation was commenced to investigate the source of such disparate treatment, in spite of the fact that defendants David Harris, Bill Jordan and the City of Seminole knew of the sexual harassment and

disparate treatment of the plaintiff in her employment.

It is plaintiff's further claim that defendants have engaged in extensive and illegal retaliatory acts, both prior to and subsequent to the filing of this suit.

Defendants deny that plaintiff was treated in a discriminatory manner or was sexually harassed while employed by the Seminole Police Department. Defendants further deny that plaintiff has been damaged in any way.

Certain portions of plaintiff's claims, in particular her claims under Title 42 U.S.C. § 1983, under Oklahoma statutes prohibiting discrimination, and her claim for intentional infliction of emotional distress were tried to a jury before this Court on June 5th through June 8th, and June 11th through 14th, 1984, wherein the jury found in favor of plaintiff and against defendants and awarded damages in the amount of $150,000.00 against the City of Seminole, Oklahoma, and $1.00 against Lt. Larry Herdlitchka.

Now before this Court for its consideration and ruling are plaintiff's claims under Title VII, 42 U.S.C. § 2000e *et seq.* The parties have submitted proposed findings of fact and conclusions of law, and the Title VII portion of the case is now ready for disposition on the merits.

After considering the pleadings, the testimony and exhibits admitted at trial, all of the briefs and arguments presented by counsel for the parties, and being fully advised in the premises, the Court enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

A. *Jurisdiction and Venue*

1. The acts of employment discrimination which gave rise to this action occurred during the years 1977 to 1984.

2. On or about June 28, 1982, the plaintiff Ramona Arnold filed an administrative charge with the Oklahoma Human Rights Commission.

3. Plaintiff filed a charge of employment discrimination with the EEOC; a Notice of Right to Sue was issued on January 11, 1983; and the plaintiff filed her complaint within 90 days of this notice.

4. The City of Seminole is an employer engaged in an industry that affects commerce and employs more than fifteen (15) employees for each working day in each of the twenty (20) or more calendar weeks in the calendar years involved herein. Thus the City of Seminole was an employer within the meaning of Title VII during the calendar years involved herein.

5. The unlawful employment practices which are the subject of this action were committed in Seminole, Oklahoma, within the Eastern District of Oklahoma.

B. *Liability of Defendant City of Seminole*

6. The plaintiff is a female person residing in Seminole, Oklahoma.

7. The defendants are (a) the City of Seminole, a municipal corporation, (b) Mr. David Harris, who is also the City Manager of the City of Seminole, (c) Bill Jordan, who is Police Chief of the City of Seminole, and (d) Larry Herdlitchka, who is a Lieutenant in the Seminole Police Department.

8. The plaintiff from 1974 to the present date was an employee of the City of Seminole, having served until February, 1977 as a dispatcher in the Police Department and from February, 1977 as a police officer for the City of Seminole.

9. The plaintiff has filed her charge of discrimination with the Equal Employment Opportunity Commission and received a Notice of Right to Sue and thereafter within ninety (90) days commenced this legal action all according to the requirements of the law.

10. After being appointed Police Officer, the plaintiff attended police certification school, successfully passed the courses, and since approximately May, 1977 has served as a fully accredited and certified Police Officer.

11. The plaintiff was the first woman to be hired and to work in the Seminole Police

Department in a position other than as a secretary or dispatcher.

12. The Police Department has and does operate using three (3) working shifts. The day shift started at 7:00 a.m. and lasted until 3:00 p.m.; the evening shift lasted from 3:00 p.m. to 11:00 p.m. and the night shift began at 11:00 p.m. and terminated at 7:00 a.m. The Police Department consists of a chief, two or three lieutenants, 12 officers, a secretary, and some dispatchers.

13. From the date of first employment of the plaintiff as a Police Officer by the City of Seminole, the plaintiff has been the subject of continuing and continuous instances of sexual harassment by various male officers of the City of Seminole including the defendant Larry Herdlitchka.

14. Lt. Larry Herdlitchka has been employed by the Oklahoma City Police Department since 1975. He had been sworn as an officer by plaintiff's father, who at that time had been Chief of the Oklahoma City Police Department. Lt. Herdlitchka was hired by Chief Lemmings who had met Herdlitchka while they were both employed by the Oklahoma City Police Department. Lemmings knew that Herdlitchka had been forced to resign from the Oklahoma City Police Department because of a paternity investigation involving Herdlitchka and a juvenile female. From Oklahoma City, Herdlitchka went to the Police Department of Moore, Oklahoma, where he worked for a short period of time and resigned. When Lt. Larry Herdlitchka was hired by the City of Seminole police department in 1975, he openly told fellow officers that he had known plaintiff for a long time and that he hated her. The open harassment began in April of 1977, shortly after plaintiff was assigned to Lt. Herdlitchka's unit. He instigated derogatory comments about plaintiff, and under his "leadership," jokes became more vicious and frequent. Cartoons posted in the officers' quarters became pornographic and were directed to plaintiff. All the Chiefs of Police and Acting Chiefs knew about the facts of harassment of plaintiff, but none took meaningful action to resolve the problem. During the period 1977–1983, defendant Herdlitchka was not only known to have been the key to the harassment of plaintiff, but also he was known to have committed serious violations of Police Department policies without reprimand.

15. In early 1977, plaintiff worked mainly on the evening shift and encountered few problems. However, in April, when she was transferred to the evening shift under the supervision of defendant Herdlitchka, the harassment began. Plaintiff worked under the direct supervision of defendant Herdlitchka from April to June of 1977, and from November, 1977 to July of 1978.

16. Defendant Herdlitchka informed the plaintiff he did not believe in women officers. Herdlitchka refused to speak to the plaintiff and continually displayed hostility toward her. He told her that he would harass her until she quit or was fired.

17. Beginning in June or July, 1977, demeaning cartoons and pictures were posted for public view within the police station with the plaintiff's name written thereon. (See Pltf's Exh. 8, 10, 12, 13, 14, 15, 16, 18, 19).

18. Explicit sexual nude pictures depicting genitals in poses offensive to many people and clearly offensive to the plaintiff were placed in public view with plaintiff's name written thereon. As an example, one picture showed a man and woman naked engaging in a sex act with plaintiff's name written on it. Another showed a man having intercourse with a goat with plaintiff's name "Mona" written over the goat. Also posted was a picture of a naked woman lying down with legs apart and plaintiff's name written on private parts.

19. In May, 1977, when plaintiff was working under defendant Herdlitchka, on a posted schedule, written next to the plaintiff's name, was the word "bitch."

20. Supervisors, including Chief Lemmings, were fully advised of the continuing abuses and consciously refused to take remedial action to prevent the sexual harassment.

21. Numerous instances of officer misconduct that were false were filed against the plaintiff by male officers causing plaintiff to defend herself before the Chief of Police. The defendant Herdlitchka filed reprimands and made complaints against plaintiff that were false. On another occasion (in 1978), plaintiff was accused of sleeping on the job. The complaint was signed by fellow officer Dave Anderson. Plaintiff told Chief Lemmings that the accusation was untrue. The Chief dismissed the complaint when plaintiff showed the Chief her activity log.

22. The plaintiff was excluded from squad meetings which she was entitled to attend.

23. In May, 1978, the plaintiff was directed by the defendant Herdlitchka not to communicate complaints to the Chief of Police. (Pltf's Exh. 4). Chief Lemmings had a formal policy of right of access to Chief, but Lemmings told Herdlitchka to tell plaintiff not to come to him. Chief Lemmings himself put up a pornographic picture with plaintiff's name on it.

24. Defendant Herdlitchka manipulated officers' days off when the plaintiff was a member of his shift because he didn't want a woman in charge of his shift when he was absent.

25. Reprimands were to be confidential; however, as to plaintiff, they were made known to other personnel.

26. The plaintiff, when requested by the Chief of Police to act as juvenile officer, accepted the added responsibility without additional pay. Plaintiff's Exhibit 8 was posted on a filing cabinet for all to view. It is derogatory and demeaning to the plaintiff. (Also see Pltf's Exh. 7).

27. Officers with less service and seniority than plaintiff were appointed over plaintiff as shift commander without justification. (Pltf's Exh. 9).

28. In late 1978 Lt. Davis told plaintiff on behalf of Chief Lemmings that if plaintiff or her husband were considering filing any kind of discrimination suit against the City of Seminole, that the jobs of both plaintiff and her husband were in jeopardy. When plaintiff went to talk to the Chief to tell him that she had never threatened a lawsuit but only wanted to be treated fairly, the Chief became angry.

29. Plaintiff's husband advised the city manager, Dan Hamilton, about the sexual harassment of his wife, and about the fact that "they" were trying to run her off the force; he told the city manager to try to stop it. Hamilton issued a memo dated May 11, 1979, in which he upheld plaintiff's seniority rights as to days off, and "instructed Police Chief Tom Lemmings to speak to the officers of the Seminole Police Department and direct them to cease and desist any further alleged harassment or discriminatory (sic) practices in reference to Police Officer Arnold or any other members of the Seminole Police Department. Police Officer Arnold is to be judged based on her performance and merits as opposed to her sex. No further action is expected at this time unless further allegations are alleged." (Pltf's Exh. 11) True to his written declaration that "no further action is expected," no action was taken; and the harassment continued unabated.

30. In June, 1979, the plaintiff's minor son, Jerry, was arrested and taken to the jail. Plaintiff and her husband were required to appear at the Police Station for the purpose of removing her son. Plaintiff investigated, and eventually charges were dropped because it was determined that the arrest and detention of plaintiff's son were totally unjustified. Lt. Downing advised plaintiff that the arrest of plaintiff's son was pure harassment.

31. In July of 1979, Acting Chief Downing determined that the treatment of the plaintiff was of such magnitude that he directed a general written memorandum to all officers ordering them to refrain from directing immoral comments and objects toward other officers. (Pltf's Exh. 17). The memorandum was posted on the bulletin board for all to read and to act as a continuing reminder of the prohibited conduct. The next day, after the posting of

the memorandum, it was discovered wadded up and in the wastebasket.

32. Certain pages in the police manual that made reference to "he" and "his", male references, were underlined.

33. Because the harassment was continuing, the plaintiff in desperation went to talk to Virginia Stewart, a member of the Seminole City Council, taking various exhibits to show her and to ask for advice. The council member directed the plaintiff to again contact the City Manager about the situation. As directed, plaintiff again contacted the City Manager who became angry and refused to review the various exhibits. At this time the City Manager instructed the plaintiff "not to go to any more of my council members."

34. There were incidents when police officers parked plaintiff's vehicle unit with the keys locked within and other times other units were parked within inches of the driver's side of plaintiff's unit so it could not be entered from the driver's side.

35. A page from a July, 1979 calendar for the Department was marked with the dates and names of officers and designated time of vacations. After plaintiff's name on the calendar denoting her vacation dates was written "The wicked witch is gone." (Pltf's Exh. 19).

36. In July, 1979, when plaintiff returned from her vacation, she found in her police station mailbox a communication advising that other male officers would give up their compensation time to keep her from returning to work. (Pltf's Exh. 20).

37. In August, 1979, when officers were scheduled for appearance in court, a docket sheet was posted and officers were required to initial the dates on which they were required to appear to indicate they had seen and noted the appearance requirements. The plaintiff Ramona Arnold used the initials "R.A." To her initials was added a "T", making it read "RAT".

38. The plaintiff's father was a longtime honored and respected peace officer in Oklahoma. He had held such high and responsible law enforcement positions as Chief of Police for Oklahoma City—the capitol city of Oklahoma, and as Commissioner of Public Safety for the State of Oklahoma. The plaintiff from early childhood had revered, honored, and respected her father. From the experience of observing her father spend his lifetime as a peace officer, and believing in that honor and purpose for which a peace officer stands, plaintiff held the sole ambition to become a peace officer, to be respected and accepted as such.

In 1979, the plaintiff's father passed away and approximately two months later a state police magazine ran an article with a picture in honor of plaintiff's father recalling and recognizing his prominent life as a peace officer. The plaintiff was mentioned in the article.

On August 10, 1979, the plaintiff cut the article out of the magazine and tacked it to the bulletin board for all to see. Herdlitchka and Nalley were on the night shift that evening. The following morning when plaintiff reported for her duty shift, she found the article wadded up and placed in her mailbox.

39. At this time a number of the officers had not been speaking to or recognizing plaintiff for some time.

40. After finding the wadded-up paper with the article honoring plaintiff's father in her mailbox, she went to a room with four officers in it and inquired about who had wadded up the article and thrown it in her mailbox. All four officers denied doing so and had a good laugh.

41. The plaintiff wrote about the harassment directed toward her and requested the Chief to take it to the City Manager. (Pltf's Exh. 22). The City Manager directed that the problems be handled in the department and took no further action nor made further inquiry.

Thereafter, on August 14, 1979, Chief Downing called a meeting of all officers and informed the plaintiff he intended to "ramrod" the meeting. After the officers assembled, the Chief surprised the plaintiff

by stating "Mona wants to air things" and gave the floor to the plaintiff.

42. The written record of the meeting, dated August 14, 1979, closed with this statement: "The discussion went on in this tone for some time, but nothing really settled. It was suggested by Downing that (sic) to wait a week, simmer down, and talk again and try to work something out." (Pltf's Exh. 24). Nothing in the record before the Court indicates that any action was taken by Chief Downing or his successors to deal with the issues raised in this meeting.

43. On September 22, 1979, Lt. Herdlitchka filed a reprimand as to plaintiff Arnold for her alleged failure to obey his order to pick up Officer Nalley at his residence and bring him to work because Nalley's car had failed to start. (Pltf's Exh. 26). Plaintiff filed a response to the reprimand, explaining that at the time of the request, she had two accident reports to prepare and paper work on three arrests to complete. (Pltf's Exh. 27). She told this to Herdlitchka, who was not on duty, and also informed him that she was the only officer on the day shift and would probably be there an hour overtime as it was. In addition, plaintiff was not assigned to Herdlitchka's shift, and it was not departmental policy for lieutenants to give orders to officers on other shifts. Plaintiff advised the Chief that she felt that Herdlitchka or another off-duty officer could have gone to pick up Officer Nalley, but that they did not want to stop listening to the ballgame.

44. On October 2, 1979, Chief Downing issued a memo regarding Herdlitchka's charges. The memo states in pertinent part:

After investigating the charges of Lt. Herdlitchka and the rebuttal of officer Arnold, I find that the order was invalid and did not pertain to Police Department Policy. Nowhere in Department Policy does it say that rides will be furnished to and from work for the officers. This has always been done as a matter of courtesy, but it is not a part of Department Policy.

Therefore no charges will be filed on Officer Arnold and the case is closed. (Pltf's Exh. 28).

45. In 1983, when plaintiff was looking through her personnel file, she found the reprimand filed by Herdlitchka; however, plaintiff's response and Downing's finding of "no justification" were missing from the file. At that time, she found two other reprimands in the file she had never seen or heard of before, regarding incidents which occurred in 1980. One from Lt. Davis stated that she had come to work under the influence of drugs or had come under the influence of drugs while working. One from Sgt. Smith stated that she had taken a break to help a woman whom plaintiff had taken off a bus to have a baby. Plaintiff stated that she had taken her lunch break to help the woman.

The normal departmental policy was to give an officer opportunity to respond to written reprimands. Plaintiff was not given such an opportunity as to these two reprimands.

46. In October of 1979, while plaintiff was away from the station checking on an auto accident victim, Officer Sweeny called and ordered her back to the station "to take calls." When plaintiff returned to the station, she found that no calls were waiting or had been waiting. When plaintiff questioned Sweeny about the non-existent calls, he made fun of her, stuck his finger in her face, and spoke obscenities. He then pushed her across the room, knocking her into a file cabinet and bruising her. She tried to call the Acting Chief, but Sweeny took the phone away from her, and pulled the cord out of the receiver and out of the wall. Sweeny shoved her several more times.

47. Plaintiff eventually notified Chief Downing. He asked for a report and she submitted one. (Pltf's Exh. 29). Chief Qualls arrived in November of 1979. Although Qualls said he would reprimand Sweeny, he did not. He merely changed Sweeny's shift, which Sweeny wanted anyway.

48. After Chief Qualls came, an exercise room was built upstairs in the station. Someone put a face on one punching bag with the words "Mona hit me, hate me." The other punching bag had a face on it with the words "Mona love me." Plaintiff asked Chief Qualls and Lt. Davis to remove these pictures and words, but they refused. They laughed at her and told her she was letting it bother her too much. Later, when Chief Jordan arrived, he also refused to remove them, saying that they were there when he got there. This situation lasted for two years. Lt. Herdlitchka told officer J.R. Scott, in regard to the pictures on the punching bag, "That's all women officers are good for."

49. On another occasion, in 1980 while Qualls was Chief of Police, a coiled snake, later determined to be dead, was placed in the police vehicle which plaintiff normally drove. However, another officer, James Hill, found the snake. Hill was so upset that he took a photograph of the snake and presented the pictures to Chief Qualls. The next day, Lt. Herdlitchka told Hill that he wished Hill had not done that. He also told Hill that he (Herdlitchka) had planted the snake in the car he thought plaintiff would be driving. Otherwise he wouldn't have planted it there. The snake was intended as continuing harassment of plaintiff.

50. In July 1980, during Chief Qualls' tenure, plaintiff was working the evening shift with Officer James Hill. Plaintiff was called to back up Officer Hill who was breaking up a fight at Marie's Bar. Plaintiff arrived and proceeded to assist Officer Hill by removing a woman who had attempted to interfere with Hill by climbing on his back. She also brought the onlooking hostile crowd under control. Later several auxiliary officers and Lt. Herdlitchka arrived on the scene. When plaintiff returned to the station, she discovered that Lt. Herdlitchka or one of the auxiliary officers present had changed the arrival times on the radio log so that Herdlitchka appeared to have arrived seven minutes earlier than plaintiff. Plaintiff's name was written on the log with an arrow pointing to her arrival time and the question "Where was Mona during this time," insinuating that she failed to back up her fellow officers. Lt. Herdlitchka also told Officer Hill to write his report saying that plaintiff did not get there to back him up. Hill later wrote a correction of his incorrect report.

51. When the department got new vehicles, male officers got them. Plaintiff was required to drive an old unit. She was told that as a woman, she didn't know how to take care of it. (Plaintiff's exhibits 30 and 31 are examples of anonymous notes posted in the station, insinuating that she was incapable of caring for her vehicle.) Plaintiff's old unit was numbered 12. When the new unit 12 came in, plaintiff was taken off unit 12 and assigned to the bottom of the list with some of the new officers. However, one new officer was assigned to new unit 12.

52. In 1981 plaintiff went to the firing range and received high scores. Shortly thereafter, a newspaper article was posted in the station to the "Attention (of) Mona Arnold". The headline read: "Cop is fined for 'terrible' shot". (Pltf's Exh. 32).

53. While Chief Qualls was there, two locker rooms were built, one for men and one for women. Plaintiff was asked to find lockers for these rooms, which she did. The lockers were then installed for the men, but not for plaintiff. After she complained, they got her one, but said she'd have to get it up to the second floor by herself.

54. In July of 1981, while Herdlitchka was Acting Chief, plaintiff found a manila envelope in her mail box, with these words on it: "To Mona—Please look inside." (Pltf's Exh. 33). Inside the envelope were a number of photos and magazine pages showing male genitals and a package of condoms. Plaintiff was deeply hurt and depressed by this event.

55. Bill Jordan became Chief of the Seminole Police Department on September 1, 1981.

Soon after he arrived, plaintiff informed him of the ongoing sexual harassment, and

of her belief that Herdlitchka and his men were behind it. Jordan told her that this happened before he got there, and couldn't do anything about it. However, when another incident occurred a few weeks later, he recommended to plaintiff "not to make a big deal out of it."

56. In 1981, before Chief Jordan came, a picture of a nude woman was posted on Herdlitchka's locker door, which was always kept open. Below the picture was plaintiff's name and the words "Do women make good cops—No—No—No." The picture remained in Herdlitchka's locker while Herdlitchka was Acting Chief of the Seminole Police Department. Later in 1981, after Chief Jordan arrived, plaintiff complained to Chief Jordan, who became angry and replied that Herdlitchka could have anything he wanted, and he (the Chief) wasn't about to make him remove the picture. The Chief told her that she was too "picky." The public could see the picture on the locker door as the locker was on the route to the Chief's Office. After the meeting in June, 1982, with the City Manager, Chief Jordan made Herdlitchka take the picture out of his locker.

57. Plaintiff again approached Jordan in February, 1982, about an incident in which Herdlitchka attempted to embarrass her over the radio. However, he did nothing about it. He did not make them take nude pictures down, but did tell officers to keep locker doors closed.

58. Jordan told each new employee that there was a running feud between plaintiff and Herdlitchka, and if they wanted successful employment, they should not take sides.

59. In early March of 1982, plaintiff received a series of clippings from magazines and newspapers for job applications. These clippings were usually placed on her clipboard or in her locker in the ladies' restroom. The positions advertised included dishwasher, waitress, cook, mechanic, police officer and town marshal. Plaintiff reported these incidents to Chief Jordan. Plaintiff's clothes were also hidden. She expressed concern because in the past, the posting of such clippings had been followed by "filthy" pictures. Chief Jordan said that he was only concerned with things that happened after he took the position of Chief, and didn't want to hear anything more about it. He again advised her that she was too "picky."

60. On March 19, 1982, another filthy picture was put in plaintiff's mailbox. (Pltf's Exh. 36). Only police officers had access to these boxes. Plaintiff did not approach the Chief about this incident, because he had failed to take action in the past. Not knowing what to do, plaintiff drove to her husband's place of work to talk with him about it. Plaintiff's husband, who was employed by the Fire Department of the City of Seminole, then went to speak to Herdlitchka and the Chief about the incident. However, the Chief was out of town. Later Chief Jordan came to the fire station. He was angry and yelled at plaintiff's husband, who yelled back. He told Jordan that he had one week to correct the situation or he would show the pictures around town so that people would know what type of people they had at the police department. The Chief stated that he didn't know what to do about it. He asked plaintiff what she wanted done about it. He was asked to look into the lockers. The Chief replied, "I'll handle this in my own way."

The Chief then called all officers to a meeting on March 23, 1982. He then individually called each officer to his office and taped interviews with them. After the meeting, the Chief forced Dave Anderson to resign. However, the harassment of plaintiff continued after the meeting.

61. The continuing harassment consisted of rolling down the windows of plaintiff's car so the seats became wet, removing plaintiff's name from her mail shelf, and eventually removing the shelf altogether. Chief Jordan put the shelf back after plaintiff complained to him.

62. In May, 1982, when plaintiff was on guard duty at Seminole Junior College, she took a guard dog with her, after advising Chief Jordan and the Chamber of Com-

merce. When she arrived at the College, the Chief met her and said that he had received a phone call complaining that her dog had attacked a child. She explained to the Chief that the dog had never gotten out of plaintiff's vehicle. She further explained that only one other officer knew that she had taken the dog. The Chief later told her that he had told Lt. Herdlitchka and his men that he was angry about the incident and that their "little trick" didn't work. Nothing else was ever done about the incident, even though plaintiff asked for an investigation.

63. In 1982, plaintiff's husband went to State Senator Dawson to seek advice in how to deal with the situation. Senator Dawson said that he would contact the city manager and did so in June of 1982.

64. In June, 1982, plaintiff went with the Chief to see Dave Harris, the City Manager, about these things. The City Manager said, "I don't know what to do. This is the Chief's problem." Both Harris and the Chief got angry. Plaintiff offered to take a lie detector test. Finally they told her to go do the investigation herself and if she could prove who did it, they would be fired.

Dave Harris refused to look at the materials which plaintiff had brought along as exhibits, because this incident had occurred before he became City Manager. When plaintiff asked that lie detector tests be given, Harris replied that he couldn't force anyone to take such a test, and that such tests were not admissible in court.

65. In June of 1982, when plaintiff was having coffee with other officers, one said, "Mona, something was put down the barrel of your shotgun." She found a plug about two inches long. It looked as if someone had shoved the barrel into wet ground. Lt. Dexter Davis then cleaned the gun for her. He was requested to notify the Chief.

66. Plaintiff then contacted two members of the Seminole City Commission, Virginia Stewart and Reverend Wallings, regarding the harassment. The City Commission never took any steps to end the harassment of plaintiff.

67. Plaintiff then filed a complaint with the Oklahoma Human Rights Commission. After plaintiff filed her complaint with the Oklahoma Human Rights Commission, in July, 1982, a fellow officer, J.R. Scott, was asked to write a report to the Commission. When Chief Jordan found out that Scott had sent a statement to the Commission, he became angry and told Scott: "I thought I told you not to get involved in this Arnold shit."

Scott was later fired for drinking alcoholic beverages within the city limits at the Ramada Inn. This was apparently mere pretense, since there was ample evidence that other officers drank alcohol at the same establishment, including Lt. Herdlitchka, who was a member of the private club at the Ramada Inn. On September 1, 1982, Dave Harris, the City Manager, responded to the Oklahoma Human Rights Commission on behalf of the City of Seminole and the City of Seminole Police Department stating as follows with regard to the Complaint of plaintiff: "We do not wish to enter into a Settlement Agreement. We understand that the Commission will have to conduct its regular investigation process in order to expedite the charge."

Plaintiff's husband, who is a fireman for the City of Seminole, was told that if his wife filed a discrimination complaint, both husband and plaintiff would be fired.

68. After plaintiff filed her complaint with the Human Rights Commission, the position of Lieutenant became available. Plaintiff then wrote a letter, dated July 12, 1983, to Chief Jordan which stated as follows in pertinent part:

> Please consider me as a candidate for the position of Lieutenant now open through our Police Department. I understand you do not plan to fill the position immediately, but I would like to ask you to please accept this as a letter of intent. (Pltf's Exh. 38).

Chief Jordan called plaintiff into his office and had Lt. Davis taking notes. The Chief said, in reference to plaintiff's letter of application, "What is this? If I want any-

thing, I'll ask for it." The Chief then tossed the letter over to plaintiff.

69. After this lawsuit was filed, on February 25, 1983, Tommy Gaines, a known drug and alcohol addict, called plaintiff "out of the clear blue" and asked her to come to see him. He said it would only take five minutes and that it was urgent. When she arrived, Gaines told her that "the County" had tapped his phone and was taping conversations. In exchange for a reduced sentence, Gaines was to try to set plaintiff up in an illegal drug transaction. He said that the Seminole Sheriff's office and the City Police were involved. The history of this conspiracy follows.

70. In 1983, Thomas Lee Gaines, a resident of Seminole, Oklahoma, was charged with burglary in the second degree and with illegal sale of drugs. Mr. Gaines' court-appointed attorney, Mark Phelps, who was also the city attorney of the City of Seminole, worked out an arrangement with the District Attorney. Mr. Phelps notified Mr. Gaines about the arrangement in a letter dated October 12, 1983, which states as follows:

Re: State vs. Gaines (two cases)

Dear Thomas:

This District Attorney has offered a package deal on the burglary and the dope sales cases.

The deal is two years on each charge with one year suspended on each charge to run concurrently. This means you will have one year to do which is the equivilent (sic) of 3–4 months hard time before parole.

I just discussed this on the phone with you. We will wait until the jury docket in November to do something.

Cordially,

/s/ Mark Phelps

71. Mr. Gaines appeared in Court on November 18, 1983, but did not plead guilty. His attorney, Mr. Phelps, notified the judge that a "deal" had been made.

72. Some time after November 18, 1983, Terry Morris, a deputy sheriff of Seminole County, came to Gaines' home and left a subpoena, requiring Gaines to testify against Larry Self, a well-known member of a motorcycle gang. Later in the evening Morris returned and asked Gaines if he would like the subpoena "taken care of." Morris then told Gaines that a fellow officer, Larry Herdlitchka, had been wronged. (Pltf's Ex. 69, p. 15). Gaines told Morris that he was afraid to testify against Self, and that he wanted to talk to Herdlitchka about "fixing" the subpoena, since he knew Herdlitchka was behind the whole thing. (Pltf's Ex. 69, p. 16).

Gaines then called his attorney, Mark Phelps, and asked him to come over because " 'There's some bad stuff coming down.' " *Id.* After Phelps arrived, Morris returned with Herdlitchka and all four had a meeting in the County police car about a half block from Gaines' home. Herdlitchka threatened Gaines with the possibility of filing more drug charges against him. It was then suggested at this meeting that Gaines should go the next day to the office of Donald Beggs, the District Attorney of Seminole County. Herdlitchka, Morris, Beggs, Phelps, and Gaines were present at this meeting. (Pltf's Ex. 69, p. 20). Phelps said he was going to try to make another "package deal." *Id.* p. 21. Then a tape recording was played for Gaines, of a conversation between Gaines and a person named Roger Leaf. Herdlitchka told Gaines that he possessed additional tapes as well. (*Id.* p. 25). Beggs then told Gaines that he would get him "three years suspended sentence if I would do Ramona, or I would get 60 years, if I didn't." *Id.* p. 23.

73. The essence of the scheme was to get Gaines to sell valium to plaintiff or to buy some from her. However, they told Gaines that they wanted "dirt" on Ramona. Since Beggs had threatened Gaines with a 60-year sentence, and Phelps had told Gaines that Beggs had the power to do it, Gaines made up a false statement about plaintiff.

74. Gaines was also supplied with a tape recorder, tapes, and a phone tap by Terry Morris. Gaines recorded three con-

versations with plaintiff, and along with a voluntary statement of his own, supplied the tapes to Morris.

75. Morris also tried but failed to take photos of plaintiff at Gaines' home.

76. In order to facilitate the efforts of Gaines to "get" plaintiff, Morris got a schedule from the Fire Department showing when plaintiff's husband would be at work and out of the way.

77. Gaines eventually told plaintiff that "They're trying to make me make you dirty, and I'm not going to do it." The next day Gaines began making tapes of his conversations with Morris, which he gave to plaintiff's lawyer. Gaines told plaintiff that "the county" and four officers of the Seminole Police Department and the Seminole County Sheriff's Office were involved and were the people to whom he was to report.

78. In 1982, Lt. Herdlitchka had a sticker (on his car) which read: "Do women make good police officers?" The answer "No" was written in. At this time, the attitude of other officers was hostile and vicious. There was a concerted effort to drive plaintiff off.

79. The continuing course of sexual harassment directed toward the plaintiff was known by the various chiefs of the Police Department of the City of Seminole from 1977 to and through the present time including the Chief of Police at the time of this trial and defendant, Bill Jordan.

80. Much of the harassment which plaintiff has undergone can be traced to defendant Herdlitchka directly or indirectly. The harassment of plaintiff began when he was her supervisor. When Herdlitchka was Acting Police Chief, he knew plaintiff was distressed about the ongoing forms of sexual harassment in the Department, but he did nothing to stop it. Herdlitchka talked openly to other officers about running plaintiff off of the force. He said if she was harassed enough, she would quit. Most of plaintiff's harassment came from Lt. Herdlitchka's shift, or from Herdlitchka himself. Plaintiff's working environment was hostile over the entire period of her employment as an officer for the Seminole Police Department. Some officers were sympathetic to her problems, but were afraid to become involved because of reprisals.

The various city managers of the City of Seminole from 1977 to 1984 knew of the ongoing harassment of plaintiff. Although on isolated occasions some effort was made to issue memos on the subject, no serious efforts were made, either by the city managers or by the various police chiefs, to deal with Herdlitchka or other officers, whose harassing acts were well-known in the department. Authority and responsibility for dealing with plaintiff's complaints of harassment were delegated by the city managers to the police chiefs, who failed to take meaningful measures to put an end to the harassment of plaintiff. In addition, each chief declined to accept responsibility for the acts or omissions of his predecessors, and thereby created an atmosphere of permissiveness which allowed the discrimination and harassment to flourish unhindered.

81. The individual defendants herein were personally responsible for and were significant actors in an overall pattern of continuing discrimination, harassment, and retaliation against plaintiff for the sole reason that she is a woman. Although various people occupied the position of Chief and of City Manager, and although all of them had full knowledge of the harassment of plaintiff by employees of the Police Department of the City of Seminole, city officials passed full responsibility for ending the harassment to the Chiefs, who in turn failed to take appropriate measures to stop the harassment.

82. The plaintiff suffers from sexual assault stress syndrome caused by the sexual harassment and discrimination detailed herein; in addition, she suffers from physiological problems induced by stress and anxiety. At present, and perhaps into the foreseeable future, plaintiff is unable to return to the hostile working environment of the Seminole Police Department.

83. Plaintiff suffers from post-traumatic stress syndrome, that is, a severe reaction to very unusual stress conditions. It is a condition which is characterized by an inability to let go of the trauma. The circumstances of the stress keep coming back to plaintiff. She continues to relive the circumstances which caused and continue to cause the stress. Her sleep patterns have been and continue to be disturbed. She had and continues to have extremely high blood pressure; in fact, her blood pressure has been nearly at stroke level.

84. The massive anxiety and depression from which plaintiff has suffered and continues to suffer is of the same kind and intensity as that resulting from sexual assault.

85. Plaintiff also suffers from the rejection and lack of support of her peers, and from the constant threat of losing her job. Her sense of identity was entirely anchored to her role as a police officer. The overt rejection, harassment, and discrimination by her peers was perceived by plaintiff as a rejection of self, resulting in great damage to her personality structure. Her sense of selfhood, her view of the world, of justice, and of the police as guardians of justice were severely assaulted. She will require at a minimum several years of weekly sessions with a psychologist or psychiatrist to reach a stable status. One psychiatrist, witness for the defendant, testified that she could not say that plaintiff would ever recover.

86. The onset of plaintiff's physical and mental problems commenced after the harassment and discrimination began in the Seminole Police Department. It is clear that her physical and mental problems are a direct result of the discriminatory practices and sexual harassment of the defendants herein. It is further clear that plaintiff cannot continue to function as a police officer in the City of Seminole without extensive psychotherapy, and not unless she is fully accepted as a female officer, and not unless the discriminatory practices in the Seminole Police Department are totally eliminated.

87. Plaintiff has been unable to return to work at the Seminole Police Department essentially since January 1, 1984, due to the deterioration of her physical and mental health as outlined above.

## CONCLUSIONS OF LAW

### A. *Jurisdiction*

1. All filing requirements of Title VII of the Civil Rights Act of 1964, as amended in 1972 (Title VII), which are a prerequisite to the jurisdiction of this Court, have been satisfied by the plaintiff herein. Title 42 U.S.C. § 2000e–5(e), (f)(1).

2. The defendant City of Seminole, Oklahoma, is an employer subject to the provisions of Title VII. 42 U.S.C. § 2000e(b), (h).

3. Venue is properly laid with this Court. 42 U.S.C. § 2000e–5(f)(3).

### B. *Burden of Proof*
#### Disparate Treatment Claim

4. The test most often used for determining whether a plaintiff has proved a *prima facie* case of employment discrimination was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Plaintiff can establish a *prima facie* case by proving: "(i) that [s]he belongs to a protected minority; (ii) that [s]he applied for and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

5. While the *McDonnell Douglas* test above applied specifically to hiring discrimination, the same general test has been applied in cases involving discrimination in working conditions.

6. The four-element *McDonnell Douglas* test is by no means the only way of proving a *prima facie* case of discrimination. As the Supreme Court noted in *McDonnell Douglas, supra,* "The facts

necessarily will vary in Title VII cases, and the specification above of the *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas v. Green, supra*, at 802 n. 13, 93 S.Ct. at 1824 n. 13.

7. The Supreme Court has recognized two separate theories under which plaintiff may be entitled to relief under Title VII: (1) disparate treatment and (2) disparate impact. *International Brotherhood of Teamsters v. United States, et al.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). "Disparate treatment", which involves situations in which an employer treats some employees less favorably than others because of race, color, religion, sex, or national origin, requires proof of discriminatory motive, which can, in some instances, "be inferred from the mere fact of differences in treatment." *Teamsters v. U.S., supra*, 335, n. 15, 97 S.Ct. 1854, n. 15. *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1166 (5th Cir.1980).

8. As set forth in *McDonnell Douglas Corp. v. Green, supra*, the allocation of burdens and order of presentation of proof is as follows: "First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* 411 U.S. p. 802, 93 S.Ct. p. 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons, but were a pretext for discrimination. *Id.* p. 804, 93 S.Ct. p. 1825. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

9. "The burden of establishing a *prima facie* case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that [s]he applied for an available position for which [s]he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine, supra*, 253, 101 S.Ct. 1093.

10. Plaintiff has established a *prima facie* case of disparate treatment as to working conditions which defendants have failed to rebut.

### Sexual Harassment Claim

11. A pattern of sexual harassment inflicted upon an employee because of her sex is a violation of Title VII if the following elements are established:

a. the employee belongs to a protected group;

b. the employee was subject to unwelcome sexual harassment;

c. the harassment complained of was based on sex; and

d. the harassment complained of affected a term, condition, or privilege of employment, within the meaning of Title VII. *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982).

12. Sexual harassment includes verbal or physical conduct of a sexual nature which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. 29 C.F.R. § 1604.11(a). "Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined with regard to the totality of circumstances." *Henson, supra*, 904; 29 C.F.R. § 1604.11(b) (1981).

13. Title 29 C.F.R. § 1604(c) states that "an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless

of whether the employer knew or should have known of their occurrence."

14. Title 29 C.F.R. § 1604.11(d) states that "With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." Similarly, the court in *Henson, supra,* at 905, held that knowledge of the employer can be inferred by a showing that plaintiff complained to higher management of harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.

■ 15. Plaintiff has carried her burden of proving sexual harassment by defendants.

### Retaliation Claims

16. Title 42 U.S.C. § 2000e–3 provides as follows in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [that employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [that employee] has made a charge, ... under this subchapter."

17. "The order and allocation of proof for Title VII suits set forth in *McDonnell Douglas Corp. v. Green, supra,* is applicable to actions for unlawful retaliation under this section. ... The plaintiff must first establish a *prima facie* case of retaliation by showing that she engaged in a protected activity, that she was thereafter subjected by her employer to adverse employment action, and that a causal link exists between the two. ... To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Essential to a causal link is evidence that the em-ployer was aware that the plaintiff had engaged in the protected activity. ..." (citations omitted).

*Cohen v. Fred Meyer, Inc.,* 686 F.2d 793 (9th Cir.1982).

18. "Once the plaintiff has established a prima facie case, the burden of production devolves upon the defendant to articulate some legitimate, non-retaliatory reason for the adverse action ... The defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff. ... If the defendant meets this burden, the plaintiff must then show that the asserted reason was a pretext for retaliation. ... The ultimate burden of persuading the court that the defendant unlawfully retaliated against her remains at all times with the plaintiff. ..." (citations omitted)

*Cohen v. Fred Meyer, supra,* 796.

■ 19. Plaintiff has carried her ultimate burden of proving that defendants unlawfully retaliated against her for engaging in activity protected under the Act.

### C. *Liability of Defendant City of Seminole*

■ 20. The plaintiff made out a *prima facie* case of sexual discrimination and retaliation in employment against the defendant City of Seminole. Members of the governing body of the City of Seminole, the various city managers during the period of plaintiff's harassment, and the various Chiefs of Police of the City of Seminole all had knowledge of the nature and extent of the continuing harassment of plaintiff. They also knew or could easily have discovered that Lt. Herdlitchka was the primary source of the public and unremitting illegal harassment of plaintiff. Authority and responsibility for dealing with this problem was delegated by city officials to the various Chiefs of Police who, in essence, denied

the problem existed and refused to confront Herdlitchka or to take any effective measures to stop the harassment of plaintiff. In fact, at least one Chief joined in the harassment of plaintiff.

The record in this case clearly shows that the harassment was directed toward plaintiff only because she was a female police officer. Her record of service to the Seminole Police Department is impeccable. No male officer was treated in a similar manner at the hands of Lt. Herdlitchka and those he induced to join him in his vulgar, illegal, and destructive acts toward plaintiff. The overall working conditions of male officers were significantly different from those of plaintiff. This was known to the various Chiefs of Police, who failed to take appropriate action to change the situation. In fact, some Chiefs actually approved of or created the unequal working conditions.

21. The burden that shifts to the defendant requires defendant to rebut the presumption of discrimination by producing evidence of a legitimate non-discriminatory reason for the discharge of the plaintiff. *Id.* 450 U.S. p. 254, 101 S.Ct. p. 1094. "The defendant need not persuade the Court that it was actually motivated by the proffered reasons. (citation omitted). It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff." *Id.* pp. 254–55, 101 S.Ct. pp. 1094–95.

22. Defendant has not met its burden of rebutting the plaintiff's *prima facie* case of sexual discrimination and harassment against plaintiff Ramona Arnold.

23. The plaintiff has established all the elements required to establish that harassment on the basis of sex, discriminatory treatment on the basis of sex, and retaliation for filing her claim under Title VII, occurred while she was in the employment of defendant City of Seminole; that the City had actual knowledge of the discriminatory treatment of the plaintiff Ramona Arnold; and that such discrimination, harassment, and retaliation was intentional.

24. The City of Seminole, Oklahoma, is liable for the continuing violations of Title VII, the discriminatory treatment, sexual harassment, and retaliation against Ramona Arnold based on her sex and the exercise of her rights under Title VII.

25. The harassment to which plaintiff was subjected over a period of many years was known to all the chiefs of the Seminole Police Department, as well as to the city manager and various city commissioners. Because at least one chief threatened reprisals against plaintiff and her husband if she pursued her right to be free of sexual harassment, quid pro quo harassment is present as well as work environment harassment. *Cummings v. Walsh Construction Co.*, 561 F.Supp. 872, 878–79 (S.D.Ga.1983).

Although some courts have argued that sexual harassment, unlike other forms of harassment, does not involve behavior that is intrinsically offensive, there is no doubt that most, if not all, of the harassment detailed herein is fundamentally offensive. These actions against plaintiff were for the most part highly public and were known to various chiefs not only through plaintiff's complaints but through first-hand experience. Many of the chiefs and the city managers did not appear to recognize or admit that the harassment was more than good fun or regular and expected behavior of police officers. The chiefs and the city managers were clearly unwilling to confront the problem and the problem-makers, in particular, Lt. Herdlitchka. In a very small department such as the Seminole Police Department, it would have been relatively simple to put an end to the harassment of plaintiff had anyone in authority chosen to do so.

■ Therefore, in such a workplace, where sexual harassment is not only condoned by those in authority but also is not admitted to be harassment and discrimination, it is imperative that educational efforts be instituted to prevent future occurrences.

241

71871

## D. Title VII Remedies

■ 26. A finding of a violation of Title VII presumptively entitles the victim of the discrimination to back pay and retroactive promotion or reinstatement. *Franks v. Bowman Transportation Company*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Plaintiff should be awarded back pay and retroactive reinstatement unless the defendant can prove by clear and convincing evidence that the plaintiff would not have been retained, even if there had been no discrimination. *Day v. Mathews*, 530 F.2d 1083 (D.C.Cir.1976).

■ 27. Notwithstanding a prevailing plaintiff's presumption of entitlement to retroactive relief, such relief is considered equitable, not legal, in nature. See *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

■ 28. Plaintiff is not entitled to compensatory damages under Title VII. *Pearson v. Western Electric Co.*, 542 F.2d 1150 (10th Cir.1976); *Wright v. St. John's Hospital*, 414 F.Supp. 1202 (N.D.Okl.1976).

29. It is also clear that punitive damages are not available to a successful plaintiff in a Title VII case. *Pearson v. Western Electric Co. supra*, 1152.

30. As to remedies available in Title VII cases, Title 42 U.S.C. § 2000e–5(g) provides as follows:

If the court finds that the [defendant] has intentionally engaged in or is intentionally engaging in an unlawful employment practice ... the court may enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative relief as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.

■ 31. Date of termination of award of back pay is within the broad discretion of the District Court, and should be determined in light of the purpose of Title VII which is to restore the injured person to his rightful place in the economic system.

*Pearson v. Western Electric Co., supra; Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419–22, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975). Although the termination date for back pay depends upon the facts of the individual's claim, courts have frequently used the date upon which the Court finally resolved all matters affecting relief for the individual claimant. *U.S. v. Lee Way Motor Freight, Inc.*, 625 F.2d 918 (10th Cir.1979).

■ 32. Back pay includes not only salary loss but also compensation for lost overtime, shift differential, and fringe benefits. *U.S. v. Lee Way Motor Freight, Inc., supra.*

■ 33. According to statutory provision, 42 U.S.C. § 2000e–5(g), back pay awards against local governments cannot extend more than two years before the date the initial charge was filed with the EEOC. *U.S. v. Georgia Power Co.*, 474 F.2d 906 (5th Cir.1973). *Albemarle Paper Co. v. Moody, supra; U.S. v. Lee Way Motor Freight, supra*, 933.

■ 34. Back pay need not be proved to an exact, mathematical certainty. The wrongdoer bears the risk of the uncertainty it has created. *See Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598 (7th Cir.1979); *Hairston v. McLean Trucking Co.*, 520 F.2d 226 (4th Cir.1975); *Fabian v. Independent School Dist. No. 89*, 409 F.Supp. 94 (W.D.Okla.1976).

■ 35. For the acts of sexual discrimination in employment committed against plaintiff Ramona Arnold in violation of Title VII, defendant City of Seminole is liable to the plaintiff for back pay in the amount of $1,000.00 per month and interest thereon at the legal rate from January 1, 1984 to this date, until paid.

■ 36. In fashioning a proper remedy pursuant to Title VII, courts must have broad discretion in fashioning relief to adequately further the purposes of the act, that is, a congressional determination that continued discrimination in employment is against the public interest. The Supreme

Court has held that affirmative action plans are consistent with the purposes of the act, and indeed may be necessary to break down historic patterns of discrimination. *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

The final guidelines on sexual harassment in the workplace (29 C.F.R. §§ 1604.-11(a)–(f) define sexual harassment broadly:

>   (a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

The general goal of the guidelines is *preventative. Bundy v. Jackson,* 641 F.2d 934, 937 (D.C.Cir.1981). Indeed, 29 C.F.R. § 1604.11(f) states as follows:

>   (f) Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned.

Therefore the City of Seminole, Oklahoma is ordered to raise affirmatively the subject of sexual harassment with all employees and to inform all employees that sexual harassment and discrimination violate Title VII of the Civil Rights Act of 1964, the guidelines of the EEOC, and the policy of the City of Seminole (if the latter is the case). The city manager, in cooperation with departmental superiors, must establish a plan whereby employees who experience sexual harassment or discrimination, whether the ground of discrimination is race, color, religion, national origin, or sex, may complain immediately and confidentially. An important part of a preventative plan is an effective procedure for investigating, hearing, adjudicating and remedying complaints of sexual harassment and discrimination. *Bundy, supra.*

These procedures must guarantee the complainant a prompt and effective investigation, an opportunity for informal adjustment of the discrimination, and if such procedures prove inadequate, a formal evidentiary hearing. These procedures must provide notice to employees, supervisory and non-supervisory, of the consequences of discriminatory behavior. Finally, these procedures must provide for a means of notice to any employee denied relief under these procedures of his or her right to file a civil action in district court.

In addition, the City of Seminole, through its departmental supervisors and other agents, must generally develop a plan to prevent sexual harassment and discrimination within all agencies, offices and departments of the city.

37. The Court hereby orders that the defendant City of Seminole, along with its supervising employees, agents, and all those subject to its control or acting in concert with it are enjoined from causing, encouraging, condoning, or permitting the practice of sexual harassment of female employees by male supervisors, and employees: to-wit, any unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, when submission to such conduct is explicitly or implicitly a requirement of the individual's employment, or used as a basis for any employment decision concerning that individual, or when such conduct has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating or hostile or offensive work environment.

Defendant City of Seminole is further required:

a. To notify all employees and supervisors in the offices and departments of the city, through individual letters and permanent posting in prominent locations in all offices that sexual harassment, as explicitly defined in the previous paragraph, violates Title VII of the Civil Rights Act of 1964, and regulatory guidelines of the Equal Employment Opportunity Commission, (and the policies of the City of Seminole) and the consequences of violation of such laws and policies.

b. To develop clear and effective procedures by which employees complaining of sexual harassment may have their complaints promptly and thoroughly investigated (by a neutral factfinder) and informal as well as formal processes for hearing, adjudication, and appeal of the complaints.

c. To develop appropriate sanctions or disciplinary measures for supervisors or other employees who are found to have sexually harassed female employees, including warnings to the offending person and notations in that person's employment record for reference in the event future complaints are directed against that person, and dismissal where other measures fail.

d. To develop other appropriate means of instructing all employees of the city of the harmful nature of sexual harassment. The proposed plan of education and training for all employees of the City should also include training in detection, correction, and prevention of discriminatory practices.

Defendant shall return to this Court within ninety days to report on the steps it has taken in compliance with this Order and to present its plans for the additional measures required by paragraphs b, c and d above.

38. It is further ordered that defendant is permanently enjoined, along with its officials, agents, employees, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practice which discriminates because of sex.

39. The Court may award "front pay" to a successful plaintiff where the evidence reveals such an atmosphere of hostility or antagonism that retaliatory action is not improbable or that reconciliation is impossible. *Fitzgerald v. Sirloin Stockade,* 624 F.2d 945 (10th Cir.1980).

40. It is further ordered, that when conditions within the Seminole Police Department have been improved so as to eliminate the conditions herein described, and upon a medical release certifying that plaintiff's physical and psychological condition has improved so as to permit her return to employment in the Seminole Police Department, that defendant City of Seminole immediately assign plaintiff Ramona Arnold to that job which she would be occupying but for the discriminatory practices of the defendant, and adjust seniority, wages, salaries, bonuses, and benefits of plaintiff to that level which she would be enjoying but for the discriminatory practices of defendant. Defendant City of Seminole is further ordered to compensate plaintiff for all compensatory time and seniority she would have received but for the discriminatory practices of the defendants. Defendant City of Seminole is hereby ordered to pay plaintiff Ramona Arnold "front pay" in amount of the salary and all benefits and seniority to which she would be entitled were she reinstated pursuant to the conditions ordered herein, until she is able to find employment where she could exercise equivalent pay and could exercise equivalent responsibility, or until she can return to employment as a police officer with the Seminole Police Department. Plaintiff's physical and psychological readiness to return to such employment must be certified by her psychologist or psychiatrist and her physician.

E. *Attorney Fees, Title VII Claims and Civil Rights Claims*

1. The plaintiff herein, as the prevailing party, is entitled to the award of a reasonable attorneys' fee. 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988. *Hanrahan v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670, (1980).

2. Absent an affidavit from plaintiff's attorneys listing the factors enumerated in *Waters v. Wisconsin Steel Works of Internat'l Harvester Co.*, 502 F.2d 1309, 1322 (7th Cir.1974), the amount of the attorneys' fee cannot be determined. *See also Comacho v. Colorado Electronic Technical College*, 590 F.2d 887 (10th Cir.1979). *See also, Love v. Mayor, City of Cheyenne, Wyo.*, 620 F.2d 235 (10th Cir.1980); *State ex rel. Burk v. City of Oklahoma City*, 598 P.2d 659 (Okl.1979). Plaintiff is hereby given twenty (20) days within which to submit proper documentation to the Court. Defendant is given ten (10) days thereafter in which to respond.